**United States District Court**
For the Northern District of California

1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                    NORTHERN DISTRICT OF CALIFORNIA

7

8   CAPELLA PHOTONICS, INC.,                    No. C-14-3348 EMC

9            Plaintiff,                         **CONSOLIDATED CASES**

10       v.                                     C-14-3349 EMC
                                                C-14-3350 EMC
11  CISCO SYSTEMS, INC., *et al.*               C-14-3351 EMC

12           Defendants.                        **ORDER GRANTING IN PART AND
                                                DENYING IN PART PLAINTIFF'S**
13  _____/        **MOTION TO STRIKE AND GRANTING
                                                PLAINTIFF'S MOTION TO DISMISS**
14
                                                **(Docket Nos. 115, 116)**
15

16

17          Plaintiff Capella Photonics filed suit against Cisco Systems, Fujitsu Network

18  Communications (collectively "Defendants"), and two other parties alleging infringement of U.S.

19  Patent Nos. RE42,368 (the '368 patent) and RE 42,678 (the '678 patent).  *See, e.g.*, Docket No. 30

20  (First Amended Complaint Against Cisco).  Both Cisco and Fujitsu answered Capella's complaint,

21  and both assert inequitable conduct as an affirmative defense.  Docket No. 108 (Cisco's Amended

22  Answer and Counterclaims) (hereafter CAAC); No. 14-cv-3349, Docket No. 23 (Fujitsu's Answer)

23  (hereafter FA).[1]  Cisco also brought a  counterclaim against Capella for alleged violation of

24  California's Unfair Competition Law (UCL) related to the filing of this lawsuit.  CAAC at 22; Cal.

25  Bus. and Prof. Code §17200 *et seq.*

26

27  _____

28          [1] Unless otherwise indicated, all citations to the docket are to *Capella Photonics v. Cisco
    Systems*, C-14-3348 EMC, the lead case in this consolidated action.

United States District Court
For the Northern District of California

1    Capella now moves to strike Defendants' largely identical inequitable conduct defenses, and

2    to dismiss Cisco's UCL counterclaim. Docket Nos. 115, 116. For the reasons discussed below, the

3    Court grants Capella's motions to strike in part and denies them in part. Capella's motion to dismiss

4    is granted because Cisco has not pleaded a necessary element of the "fraudulent" prong under the

5    UCL, namely that members of the public were likely to be deceived by the challenged practice.

### I.  BACKGROUND

7    A.    Procedural Background

8    Capella filed this patent infringement action on February 12, 2014, in the Southern District

9    of Florida. *See* Docket No. 1. Capella considers itself "a pioneer of optical switching technologies

10   for use in optical transmissions networks," and the patents-in-suit are directed towards methods of

11   optical switching in such communications networks. *See* Docket No. 30 at ¶¶ 7, 12-20, 26.

12   Cisco answered Capella's complaint on April 4, 2014. Docket No. 17. Fujitsu answered on

13   April 15. FA at 25. Both answers pleaded substantially identical inequitable conduct defenses.

14   *Compare* Docket No. 17 *with* FA. Cisco's answer also contained a counterclaim for violation of the

15   UCL, predicated on Capella's alleged "bad faith" assertion of patent rights against Cisco that

16   Capella "knew to be overbroad and invalid in light of prior art, and that [] Capella obtained through

17   fraud on the Patent Office." Docket No. 17 at 25-26. After Capella filed an amended complaint,

18   and Cisco filed an amended answer, Capella moved to strike Cisco's inequitable conduct defenses

19   and dismiss Cisco's UCL counterclaim. Docket Nos. 46, 47 (Motions to Strike and Dismiss).

20   Capella did not move to strike Fujitsu's inequitable conduct defenses.

21   On July 14, 2014, Judge Seitz granted Capella's motion to strike in a one-line order. Docket

22   No. 74. Judge Seitz explained at oral argument that he felt Cisco should "cure" certain unspecified

23   "defects" in its pleading, and granted Cisco leave to amend its inequitable conduct defenses.[2]

24   Docket No. 125-4 at 8-9. The Court specifically declined to rule on Capella's motion to dismiss

---

[2] It is entirely unclear from the Florida court's order, or the available excerpts of the oral argument transcript, precisely what pleading defects the Court identified in Cisco's affirmative defenses. It is also unclear whether the Court found defects with all three separately alleged grounds of inequitable conduct, or with a discrete subset of Cisco's allegations. Cisco represents that the Court only intended to strike Cisco's "first instance" for inequitable conduct, Docket No. 125 at 7, and that is the only ground which Cisco amended after the Florida court issued its order.

United States District Court

For the Northern District of California

1   Cisco's UCL counterclaim.  *Id.* at 9.  This case was transferred to the Northern District of California

2   on July 24.[3]  Docket No. 77.

3        Cisco filed its amended and operative answer on September 15, 2014.  CAAC at 25.  On

4   September 25, Capella once again filed a motion to strike Cisco's inequitable conduct defenses

5   pursuant to Federal Rule of Civil Procedure 12(f), and to dismiss Cisco's UCL counterclaim

6   pursuant to Federal Rule of Civil Procedure 12(b).  Docket No. 114.[4]  Capella also filed a motion to

7   dismiss Fujitsu's inequitable conduct defenses.  Docket No. 115.  This motion was filed 163 days

8   after Fujitsu filed its answer.  *See* FA at 22.

9   B.  Cisco's and Fujitsu's Inequitable Conduct Defenses

10       In their respective answers, both Defendants plead substantially similar affirmative defenses

11  of inequitable conduct with respect to the patents-in-suit.  *See* CAAC at 6-20; FA at 6-20.

12  Specifically, they claim that during the re-issue prosecutions of the patents-in-suit, Capella

13  intentionally withheld or mischaracterized three different known pieces of invalidating prior art.  As

14  will be discussed in greater detail below, however, at oral argument counsel for both Cisco and

15  Fujitsu explicitly disavowed any independent reliance on two of the three pieces of allegedly

16  invalidating art pleaded in their answers, and thus Cisco's and Fujitsu's inequitable conduct defenses

17  based on these references are stricken with prejudice.

18      1.  Prosecution of the Patents-in-Suit

19       The two patents-in-suit are reissue patents.  *See* Docket Nos. 127-4, 127-5 (Patents-In-Suit).

20  In order to obtain a reissue patent, an inventor must "specifically identify [to the Patent Office] at

21  least one error" in the original patent "and state that the applicant believes the original patent to be

22  wholly or partly inoperative or invalid" due to that error.  37 CFR § 1.175(a).  Sometime around

23  June 10, 2010, Capella sought reissue of what would become the patents-in-suit.  FA at 13; CAAC at

24  13.

---

26     [3] The Florida court also consolidated each of Capella's related infringement actions for
    pretrial purposes.  Docket No. 76.  The cases were then related in this District.  Docket No. 100.

27  This Court subsequently ordered that all filings be made in Case No. 14-3348 EMC (*Capella Photonics v. Cisco Systems, Inc.*) until further order of the Court.  Docket No. 110.

28     [4] Capella filed a slightly amended version of its motion on September 30.  Docket No. 116.

In seeking re-issue of the patents-in-suit, Capella allegedly represented to the Patent Office that its originally issued patents were invalid because they claimed more than Capella had a right to claim. Specifically, Capella allegedly told the Patent Office in May 2011 that its original patents "fail[ed] to include limitations regarding the spatial array of beam deflecting elements being individually and continuously controllable in two dimensions to control the power of the spectral channels." FA at 13; CAAC at 13. Put differently, Capella allegedly admitted that its patents were invalid because their claims did not require two-dimensional (2-D) micromirrors for power control. FA at 13-14; CAAC at 13-14. Consequently, Capella sought re-issue of its patents with narrower claims that added limitations calling for 2-D mirrors for power control. FA at 14; CAAC at 14. The PTO eventually granted the amended claims as part of the reissue patents-in-suit, apparently concluding that "the prior art of record does not teach or suggest using" 2-D mirrors for power control. FA at 14; CAAC at 14. Defendants claim that Capella admitted that "the *only* allegedly novel aspects of" the reissue patents-in-suit over the prior art were 2-D mirrors and power control. FA at 14; CAAC at 13 (emphasis added).

### 2.    The "First Instance" of Inequitable Conduct

Defendants allege that the "first instance" of inequitable conduct occurred where Capella, and specifically Capella CEO Larry Schwerin, patent prosecutor Barry Young, and former CEO and current Emeritus Board Member Joseph Davis (collectively "the Applicants"), knowingly failed to cite U.S. Patent No. 6,798,941 (the Smith patent) to the PTO during the reissue prosecution of the patents-in-suit that took place in 2010 and 2011. *See* FA at 7-8; CAAC at 7. While the face of the Smith patent lists a filing date of September 20, 2001, it claims priority to a provisional application (the Smith provisional) filed on September 22, 2000. The earliest provisional application to which the asserted patents may claim priority was filed on March 19, 2001. Thus, according to Defendants, if the Smith patent is entitled to its earliest priority date, it would be prior art to the patents-in-suit.

Defendants claim that the Applicants first learned about the Smith patent sometime in 2007 when a patent examiner cited the Smith patent as prior art during the prosecution of another Capella patent on which Mr. Davis was a named inventor. *See* FA at 9-10, 12-13; CAAC at 9, 12.

**United States District Court**
For the Northern District of California

Defendants further allege that during the prosecution of this other Capella patent, the Applicants learned that the Smith patent discloses the use of 2-D mirrors for power control – the exact same features Capella allegedly told the PTO distinguished the patents-in-suit from the prior art during their reissue prosecution years later.  *See* FA at 12-13; CAAC at 12-13.

### 3.   The "Second Instance" of Inequitable Conduct

Defendants' alleged "second instance" of inequitable conduct actually appears to be two separate allegations of inequitable conduct.  First, Defendants allege that Capella concealed the true "nature of the 'mistake' on which it based the reissue of the '368 and '678 patents."  FA at 15-16; CAAC at 15-16.  Specifically, Defendants allege that Capella initially represented to the PTO that its original patents "*may* have claimed more than there was a right to claim in view of the cited prior art."  FA at 16; CAAC at 16 (emphasis added).  The Patent Office responded that "[t]he phrase 'may have claimed more'" was insufficiently specific and failed to comply with the requirement that a party seeking a reissue patent must "specifically identify [to the Patent Office] at least one error" in the original patent "and state that the applicant believes the original patent to be wholly or partly inoperative or invalid" due to that error.  FA at 16; CAAC at 16; 37 CFR § 1.175(a).  Only after the Patent Office rejected Capella's first attempt to obtain reissue patents did Capella eventually concede that its original patents were *actually* invalid in light of the prior art.  FA at 16; CAAC at 16.

Defendants' second claim is that the Applicants "said nothing about" about U.S. Patent No. 5,629,790 (the Neukermans patent) to the PTO during the reissue prosecution of the patents-in-suit, despite the Applicants' alleged awareness that the Neukermans patent disclosed 2-D mirror control.  FA at 18; CAAC at 17.  Defendants' pleadings later acknowledge that Capella did, in fact, cite the Neukermans patent to the PTO in both re-issue prosecutions.  FA at 18; CAAC at 17.  They claim, however, that Capella "mischaracterized" the Neukermans patent by telling the PTO that Neukermans disclosed certain unimportant pieces of prior art while completely failing to disclose to the PTO that Neukermans also allegedly discloses critical and invalidating prior art (*i.e.*, 2-D mirror control).

United States District Court
For the Northern District of California

4.      The "Third Instance" of Inequitable Conduct

For the "third instance" of inequitable conduct, Defendants allege that the Applicants purposefully withheld a prior art reference they refer to as the "Lucent 2-Axis Mirror."  CAAC at 18-19; FA at 19-20.  According to Defendants, Applicants knew about the Lucent 2-axis mirror – which allegedly discloses the concept of using a 2-D mirror for power control – because they themselves cited it as prior art to the Patent Office in the original provisional patent application to which both patents-in-suit claim priority.[5]  CAAC at 18-19; FA at 19-20.  Defendants allege that despite Capella's knowledge of the Lucent 2-axis mirror, Capella later "excised" any reference to the Lucent 2-axis mirror in subsequent patent filings, and failed to disclose this apparent prior art to the Patent Office during the re-issue prosecutions of the patents-in-suit.  *Id.*  Defendants further claim that Capella's lone reference to the Lucent 2-axis mirror, made in its original provisional application, was effectively hidden from the Patent Office because "without any reason to do so [] the Examiner of the Patents-in-Suit [during the re-issue prosecutions] would be unlikely to reach back and examine the provisional application that had been filed ten years earlier."  CAAC at 19; FA at 19.

5.      Alleged Intent to Deceive the Patent Office

Defendants also allege that each of the three above-described instances of inequitable conduct were performed with the specific "intent to deceive the Patent Office."  *See, e.g.*, CAAC at 20; FA at 20 ("Applicants purposely omitted the disclosure of the Lucent 2-D mirrors with an intent to deceive the PTO.").  Fujitsu's answer stated that "[t]he Applicants had strong motivations to [deceive the PTO], as they stood to profit from [the] sale of [the] company at a higher valuation or through a patent licensing campaign if the sale failed."  FA at 20; *see also* CAAC at 20 (same).  Cisco's answer alleges in even greater detail that:

> at or near the time Capella filed the reissue applications that became the Patents-in-Suit, Capella was actively trying to sell its patent portfolio (including the pre-reissue versions of the Patents-in-Suit), and was likely trying to increase the perceived value of that portfolio

---

[5] The Provisional Patent Application at issue is No. 60/277,217 filed by Capella on March 19, 2001.  The faces of both patents-in-suit claim priority to this provisional application.  *See* Docket Nos. 127-4, 127-5.

United States District Court

For the Northern District of California

1        and/or prepare it for litigation.  Executives at Capella, including Larry
Schwerin, would have known that the sale value of the company

2        would be based heavily on the value of its patent portfolio.

3 CAAC at 13.  Moreover, both Defendants assert that intent to deceive can further be inferred from

4 Capella's alleged "systematic[] withholding or obfuscating the relevance of the known prior art," its

5 "multiple attempts to hide the real 'mistakes' in the patents that were re-issued as the Patents-in-

6 Suit," and Capella's claimed practice of "amending claims to highlight distinctions over weaker,

7 disclosed, prior art while withholding art that disclosed some or all of those same distinctions."

8 CAAC at 20; FA at 20.

9 C.     <u>Cisco's UCL Counterclaim</u>

10        Cisco also filed a UCL counterclaim against Capella.  Cisco contends that Capella engaged

11 in unfair business practices by filing this infringement lawsuit against Cisco when Capella allegedly

12 knew that the patents-in-suit are invalid and were procured by fraud.[6]  CAAC at 22.  Specifically,

13 Cisco alleges that Capella violated the "fraudulent" prong of the UCL by:

14        deceptively and fraudulently obtaining patent rights and then, in bad
faith, (1) misrepresenting the validity of the patents, which it knew to

15        be false; (2) asserting those patents against Cisco and other
manufacturers; (3) filing this lawsuit; and (4) attempting to sell

16        Capella to other California businesses based in part on the
fraudulently-obtained patent rights.

17

18 *Id.* at 22-23.  Cisco prays for injunctive relief as well as restitution/disgorgement of any monies

19 Capella received from Cisco as a result of Capella's allegedly fraudulent practices.  *Id.* at 23.  Cisco

20 does not identify, however, what monies Capella received from Cisco that would be subject to a

21 UCL restitution award.

22 ///

23 ///

24 ///

25 ///

26 ─────────────────────

27        [6] In its opposition to Capella's motion to dismiss, Cisco clarifies that it "did not plead [a
violation of] the 'unfair' prong" of the UCL.  Docket No. 125 at 20.  While Cisco's complaint

28 alleges that Capella engaged in acts of "unfair competition," it only brings a claim under the UCL's
"fraudulent prong."  *See id.*

United States District Court

For the Northern District of California

## II.   DISCUSSION

A.   Legal Standards

    1.   Motions to Strike Inequitable Conduct Defenses

    Capella's motions to strike are governed by Federal Rule of Civil Procedure 12(f), which allows the Court to strike any "insufficient defense, or any redundant, immaterial, impertinent, or scandalous matter." Fed R. Civ. P. 12(f). "Motions to strike are regarded with disfavor [] because of the limited importance of pleadings in federal practice and because they are often used solely to delay proceedings." *Zep Solar Inc. v. Westinghouse Solar Inc.*, No. C-11-6493 JSW, 2012 WL 1293873, at *1 (N.D. Cal. Apr. 16, 2012) (citation omitted). "Nonetheless, the Court may properly grant motions to strike when a defense or a claim is insufficient as a matter of law." *Id.* (citations omitted). As with other attacks on the sufficiency of a pleading, the reviewing court must view the pleadings in the light most favorable to the pleader. *Id.*

    Federal Circuit law governs the sufficiency of allegations of inequitable conduct. *See Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1318 (Fed. Cir. 2009). "Under Federal Circuit law, all averments of fraud and inequitable conduct, including affirmative defenses, fall within the strictures of [Federal] Rule [of Civil Procedure] 9(b) and must be stated with particularity." *Zep Solar*, 2012 WL 1293873 at *2 (citing *Exergen*, 575 F.3d at 1326). To satisfy the "particularity required by Rule 9(b), the pleading must state the 'who, what, when, where, and how' of the misrepresentation or omission made to the PTO." *Id.* (quoting *Exergen*, 575 F.3d at 1327).

    "The essential elements of a claim of inequitable conduct under Federal Circuit law are: (1) an individual associated with the filing and prosecution of a patent application affirmatively misrepresents a material fact, fails to disclose material information, or submits false material information; and (2) the individual does so with the specific intent to deceive the [Patent Office]." *Id.* (citing *Exergen*, 575 F.3d at 1327 n.3). The "materiality required to establish inequitable conduct is but-for materiality." *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1291 (Fed. Cir. 2011) (en banc). As the en banc court in *Therasense* explained, "prior art is but-for

United States District Court

For the Northern District of California

material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art."
*Id.*

    2.    <u>Motion to Dismiss UCL Counterclaim</u>

Capella's motion to dismiss Cisco's UCL counterclaim is governed by Federal Rule of Civil Procedure 12(b)(6), which tests the legal sufficiency of Cisco's pleading. "All well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Faulkner v. ADT Sec. Services, Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013) (citations omitted). "To survive a motion to dismiss, a complaint must allege enough facts to state a claim to relief that is plausible on its face." *Id.* (internal quotation and quotation marks omitted).

B.    <u>Defendants' Inequitable Conduct Defenses</u>

Defendants alleged three separate "instances" of inequitable conduct in their answers. After carefully reviewing the Defendants' pleadings and motions papers, the Court thus assumed that each separate "instance" of inequitable conduct was just that – a claimed *instance* of inequitable conduct. Put differently, the Court understood Defendants to allege that Capella committed inequitable conduct at least three separate times: first when it allegedly withheld the Smith patent; again when it concealed the "true nature" of the mistake on which reissue was initiated, including misrepresenting the contents of the Neukermans patent; and finally when it "excised" and/or withheld any reference to the Lucent 2-axis mirror during the reissue prosecution.[7]

At the hearing on Capella's motions to strike, however, both counsel for Cisco and Fujitsu expressly (and perplexingly) disavowed half of their second inequitable conduct defense, and the entirety of their third inequitable conduct defense. Specifically, counsel represented that neither Capella's alleged mischaracterization of the Nuekermans patent, nor its claimed withholding of the Lucent 2-axis mirror, constituted inequitable conduct in its own right, and thus these actions could

---

[7] As previously indicated, Defendants' counsel added to the confusion by pleading its "second instance of inequitable conduct" to include two separate actions that could potentially constitute inequitable conduct – concealing the nature of the mistake upon which reissue was based, and mischaracterizing the contents of the Neukermans patent. Thus, as the Court previously understood Defendants' pleadings, Defendants had actually alleged four separate "instances" of inequitable conduct.

not support independent inequitable conduct defenses.  Rather, counsel stated that those "instances" of inequitable conduct were apparently pleaded simply to bolster Defendants' first inequitable conduct defense (*i.e.*, withholding the Smith patent).  In particular, Defendants claim that the Applicants misled the PTO in initially failing to disclose the severity of their problems with 2-D prior art, thus exacerbating the misleading nature of the Applicants' non-disclosure of the Smith patent and its teaching of 2-D mirrors.

The Court will hold counsel to its waiver, and thus strikes with prejudice Cisco's and Fujitsu's inequitable conduct defenses based on the alleged withholding or misrepresentation of the Nuekermans and Lucent references.  As explained below, the Court will also strike with prejudice the remaining aspect of Defendants' "second instance" of inequitable conduct, namely concealing the true nature of the "mistake" in Capella's initial reissue filing, because that claim fails as a matter of law.

However, the Court will not strike Defendants' "first instance of inequitable conduct" based on Capella's alleged withholding of the Smith patent, as the Court determines that both Defendants adequately pleaded that defense.

1.   The Remaining Aspect of Defendants' "Second Instance" of Inequitable Conduct Is Legally Insufficient

Before discussing Defendants' one legally sufficient inequitable conduct defense, the Court will attempt to put to bed the remainder of the legal quagmire that Defendants' second and third inequitable conduct defenses have become.  As noted above, Defendants conceded that their inequitable conduct allegations with respect to the Neukermans and Lucent references are insufficient as a matter of law.  The Court thereby strikes with prejudice all separate allegations of inequitable conduct relating to those references.

Defendants did not concede, however, the first part of their claimed "second instance" of inequitable conduct.  Defendants allege that the Applicants committed inequitable conduct by concealing the "true nature of the mistake" on which they sought reissue of the asserted patents.  FA at 15-16; CAAC at 15-16.  Specifically, Defendants claim that Capella initially represented to the PTO that its original patents "*may* have claimed more than there was a right to claim in view of the

cited prior art." FA at 16; CAAC at 16 (emphasis added).  Only after the Patent Office responded that Capella's averment was insufficiently specific did Capella eventually concede that its original patents were actually invalid in light of the prior art.   FA at 16; CAAC at 16.

     The Court strikes this aspect of Defendants' defenses because the behavior alleged simply cannot constitute inequitable conduct.  The PTO was not deceived by the Applicants' allegedly deceptive statement.  To prove inequitable conduct, an accused infringer must demonstrate that the "PTO would not have allowed a claim" had it not been misled. *Therasense*, 649 F.3d at 1291.  But as both Fujitsu and Cisco admit in their pleadings, the PTO actually rejected Capella's initial reissue applications because they failed to identify an error in the original patents with the requisite specificity. *See* FA at 16.  Only after Capella responded in greater detail about the mistake in its original applications (*i.e.*, there was no limitation requiring 2-D mirrors for power control) did the PTO allow the reissue patents-in-suit.  FA at 17-18; CAAC at 17-18.  There can be no inequitable conduct liability based on Capella's alleged concealment of any mistake where the PTO was not fooled by the concealment, and where Capella eventually chose to "come clean" with the Patent Office.  To the extent Defendants contend that Capella concealed the "nature" of the mistake by mischaracterizing or withholding art that discloses 2-D mirrors for power control, the Court notes that the only remaining relevant art is the Smith patent, and the Court finds Defendants' allegations regarding the Smith patent to be sufficient.  To the extent Capella sought to further rely on the Neukermans patent or Lucent reference, however, these claims have now been waived.  Moreover, as characterized by Defendants, these allegation add nothing material to the first claim of inequitable misconduct which, in the final analysis, turns on the disclosure, materiality, and intent with respect to the Smith patent.

     2.   <u>Defendants' First Instance of Inequitable Conduct is Well-Pleaded</u>

     According to Defendants, Capella committed inequitable conduct when it failed to cite the Smith patent to the PTO during the reissue prosecutions of the patents-in-suit.  FA at 8-15; CAAC at 8-15.  The Court finds that both Fujitsu and Cisco adequately pleaded this defense.

a.      The Smith Patent is Material

Defendants allege that the Smith patent is but-for material[8] prior art because it discloses the use of 2-D mirrors for power control.  *See, e.g.*, FA at 11-12.  The Court agrees.  Indeed, it is notable that Capella never challenges the materiality of the Smith patent.

The patents-at-issue are reissue patents.  In order to obtain a reissue patent, the applicant must "specifically identify at least one error" that caused the "original patent to be wholly or partly inoperative or invalid."  37 C.F.R. § 1.175(a).  Here, Defendants allege that the sole "mistake" identified by Capella was that its original patents were invalid because they did not limit their claims to require 2-D micromirrors for power control.  FA at 13-14; CAAC at 13-14.  Thus, Capella sought re-issue of its patents with narrower claims that included limitations calling for 2-D mirrors for power control.  FA at 14; CAAC at 14.  According to Defendants, the PTO eventually granted the amended claims as part of the reissue patents-in-suit, apparently concluding that "the prior art of record does not teach or suggest using" 2-D mirrors for power control.  FA at 14; CAAC at 14.

Because the PTO specifically granted Capella's re-issue patents on the ground that the prior art did not "teach or suggest using" 2-D mirrors for power control, any prior art that ***does*** teach the use of 2-D mirrors for power control is but-for material prior art:  Capella would never have received the reissue patents had the PTO believed that 2-D mirrors for power control were well known in the prior art.  Because Defendants allege that the Smith patent teaches the use of 2-D mirrors for power control, and Capella does not appear to dispute that claim, the Federal Circuit's materiality standard is met.

///

///

---

[8] As previously explained, the Federal Circuit has held that an individual commits inequitable conduct if he fails to disclose prior art to the PTO that is "but-for" material.  *Therasense*, 649 F.3d at 1291.  Failure to disclose prior art that is not but-for material, however, does not amount to inequitable conduct.  *See, e.g.*, *Nalco Co. v. Turner Designs, Inc.*, 13-cv-2727 NC, 2014 WL 645365, at *5 (N.D. Cal. Feb. 19, 2014) (holding that accused infringer failed to sufficiently plead inequitable conduct defense because it made no showing that the withheld information was not cumulative of other information disclosed during prosecution) (citations omitted).  "[P]rior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art."  *Id.*

United States District Court

For the Northern District of California

b.     Capella Knowingly Withheld Material Prior Art

According to Defendants, Capella (and specifically Mr. Davis) first learned of the Smith patent by at least 2007.[9]  FA at 9-10; CAAC at 9.  Davis was a named inventor on another Capella patent not at issue in this litigation.  *Id.*  During the prosecution of that patent in 2007, the Examiner cited the Smith patent as potential prior art on multiple occasions, and specifically noted that the Smith patent disclosed 2-D mirrors for power control.  FA at 10-11, 13; CAAC at 9-12.  Indeed, the face of the Smith patent confirms this allegation, as the very first sentence of the abstract of invention reads: "A multi-wavelength or white-light optical switch including an array of ***mirrors tiltable about two axes***, both to control the switching and ***to provide variable power transmission*** through the switch . . . ."  Docket No. 127-1 at 1 (Smith patent) (emphases added).  Thus, Defendants claim that Davis had actual knowledge of the relevant features of the Smith patent at least three years before Capella sought reissue of the patents-in-suit in 2010.[10]  Davis is a named inventor of the patents-in-suit in this action, and Defendants expressly allege that he was "substantively involved" in the prosecution of these patents.  CAAC at 9; FA at 9.  Nevertheless, Davis and the other Capella Applicants failed to cite the Smith reference to the Patent Office during the asserted patents' reissue prosecutions.

The crux of Capella's motion to strike the "first instance" of inequitable conduct is that Defendants did not sufficiently plead or establish that Smith is actually ***prior*** art to the patents-in-suit.  Capella notes that the Smith patent was filed September 20, 2001.  Docket No. 127-1 at 1.  The

---

[9] Fujitsu alleges that Davis first learned of the Smith patent in 2006.  FA at 9.

[10] Defendants also claim in a rather conclusory fashion that Schwerin learned about the Smith patent sometime in 2007.  *See, e.g.*, FA at 13 ("At least Davis and Schwerin, and possibly other Applicants were aware of [Capella's] statement" from the PTO describing Smith as disclosing 2-D mirrors for power control).  At the pleading stage, it is likely irrelevant that Defendants did not provide more factual details to support their allegations of knowledge against Schwerin, because knowledge can be pleaded generally under Rule 9(b) as long as the factual context of the complaint renders the allegations sufficiently plausible.  Here it is plausible that Davis, a named inventor who likely had actual knowledge of the PTO's rejection of his patent application over the Smith patent, would have informed his CEO, Schwerin, of that rejection and its reasoning.  This is particularly true because Defendants allege that Schwerin "has been involved in the prosecution of Capella's patents since" 2005.  FA at 9; CAAC at 9.  But even if Davis hadn't told the other Applicants about the Smith patent, Defendants' "first instance" of inequitable conduct would still be adequately pleaded with regards to Davis, and thus will not be struck.

United States District Court

For the Northern District of California

1  patents-in-suit, however, claim priority back to a provisional application filed on March 19, 2001.

2  *See* Docket Nos. 127-4, 127-5.  Thus, if the Smith patent is not entitled to a priority date earlier than

3  March 19, 2001, it cannot be prior art, and Capella and the Applicants were under no duty to

4  disclose Smith to the PTO during reissue.

5  The face of the Smith patent, however, does claim priority back to an earlier application,

6  namely the Smith provisional application filed on September 22, 2000.  The parties vigorously

7  dispute the merits of whether the Smith patent is actually entitled to this earlier priority date.  For

8  instance, Capella argues that there is no written description support in the Smith provisional that

9  would entitle the Smith patent to claim the provisional's earlier priority date (at least with respect to

10 Smith's claims regarding 2-D mirrors for power control).  *See* Docket No. 116 at 6.  But these

11 arguments are largely irrelevant at this stage of these proceedings.  At the pleading stage, the Court

12 must review Defendants' defenses in the light most favorable to them.  Defendants pleaded that the

13 Smith patent is entitled to the provisional filing date of the Smith provisional, and cite portions of

14 the Smith provisional that seem to support this argument.[11]  Thus, this Court assumes at this stage of

15 the proceedings that the Smith patent is actually prior art to the Capella patents-in-suit.[12]

16 Assuming that the Smith patent is actually material prior art to the patents-in-suit, the

17 remaining dispositive question is whether any of the Capella Applicants ***knew*** that it was prior art at

18 the time of the reissue prosecution.  Capella argues that Fujitsu's inequitable conduct defense is

19 defective because it never alleges that any applicant had actual knowledge of the contents of the

20 Smith provisional, as opposed to the Smith patent.

21 Capella's argument, however, is not well taken.  Fujitsu alleges that at least Davis knew that

22 the Smith patent disclosed 2-D mirrors for power control – the very same features that Capella later

24 [11] For instance, Cisco's answer contains an excerpt from the Smith provisional that seems to
25 support Cisco's argument that the Smith provisional does provide written description support for the
   2-D mirror control limitations in the issued Smith patent.  Specifically, the Smith provisional
26 allegedly discloses the use of a "mirror array with elements that can be rotated in an analog fashion
   ***about two orthogonal axes***. . . . [A]ngular displacement about the orthogonal axis is ***used for power***
27 ***control***."  CAAC at 12 (emphases added).

28 [12] At the hearing, Capella's counsel agreed that at this stage of the proceedings, the Court
   must assume that the Smith patent is entitled to its earliest priority date.

United States District Court

For the Northern District of California

1   cited to the PTO as a point of novelty in order to obtain reissuance of the patents-in-suit. Indeed, the

2   face of the Smith patent seems to clearly disclose these features. And the face of the Smith patent

3   also clearly claims priority to a provisional application that pre-dates any filing to which Capella's

4   asserted patents could claim priority. It is therefore a highly plausible inference that Davis would

5   have acquainted himself with the contents of the Smith provisional in order to determine whether or

6   not the Smith patent actually is but-for material prior art to either of the patents-in-suit.

7           Indeed, this is exactly the inferential reasoning that Cisco explicitly added to its pleading

8   after it was initially struck by Judge Seitz. Cisco's amended (and operative) defense alleges that

9   "Schwerin, Young, and possibly other applicants such as Davis were aware of the [Smith]

10  provisional and its contents. This is because the Smith patent lists on its face the [Smith] provisional

11  and the filing date of that provisional, and because the first paragraph in the Smith patent's

12  specification claims priority to the [Smith] provisional application." CAAC at 14. That is, Cisco's

13  defense infers knowledge of the Smith provisional from the fact that any reasonable patent applicant

14  who knew that a patent (1) disclosed but-for material art, and (2) claimed a priority date before that

15  of the applicant's own filing, would likely obtain the provisional application and determine for

16  himself whether or not that material art was material *prior* art, and thus would have determined

17  whether or not the provisional application and/or patent needed to be disclosed to the PTO. The

18  Court agrees with Defendants.[13]

19          In fact, the above logic is so plausible that Fujitsu did not need to explicitly plead each

20  inferential step in its defense in order to survive Capella's motion to strike. Fujitsu alleges that the

21  Applicants knew what the Smith patent purports to claim, and knew that the Smith patent claims

22  priority to a provisional filing that pre-dated all of Capella's filings. Under those circumstances, it

23  would be both reasonable and plausible for the Court to assume that the Applicants actually learned

24  of the contents of the Smith provisional, because the only way they could possibly determine

25  _____

26          [13] The Court does note, however, that while the Applicants' knowledge of the contents of the
    Smith provisional can be inferred at the pleading stage, drawing all reasonable inferences in
27  Defendants' favor, Defendants will have to make a far more significant showing to prevail on their
    inequitable conduct defenses at either summary judgment or trial. *See, e.g.*, *Therasense*, 649 F.3d at
28  1290 (explaining that knowledge of a material reference must be proved by "clear and convincing
    evidence").

1   whether the seemingly invalidating Smith patent actually is prior art would be to review the Smith

2   provisional and determine if the Smith patent is truly entitled to claim priority to that application.

3          In sum, Defendants "first instance" of inequitable conduct is well-pleaded.  Defendants

4   identify the who (*i.e.*, Davis and possibly the other Applicants), the what (*i.e.*, the Smith patent's

5   disclosure of 2-D mirrors for power control), the when (*i.e.*, during the reissue prosecutions of the

6   asserted patents in 2010), the where (*i.e.*, the abstract and specification of the Smith patent and the

7   disclosure of the Smith provisional), and how (*i.e.*, the Examiner would have rejected the claims of

8   the reissue patent had she known Smith disclosed 2-D mirrors for power control) of the alleged

9   fraud.  *See Exergen*, 575 F.3d at 1327.  And, as described below, Defendants also have satisfactorily

10  alleged that the Applicants knowingly withheld the Smith patent from the PTO with the specific

11  intent to deceive the Patent Office.

12                  c.      Capella Knowingly Withheld the Smith Patent With the Intent to Deceive the

13                          Patent Office

14          A finding of inequitable conduct also requires that the applicant (or applicants) withhold or

15  misrepresent material prior-art "with a specific intent to deceive the PTO."  *Exergen*, 575 F.3d at

16  1329.  While intent "may be averred generally" under Rule 9(b), a pleading of inequitable conduct

17  "must include sufficient allegations of underlying facts from which a court may reasonably infer that

18  a specific individual" acted with the requisite state of mind.  *Id.* at 1328; *see also Ashcroft v. Iqbal*,

19  129 S. Ct. 1937, 1954 (2009) (noting that "Rule 9 merely excuses a party from pleading [] intent

20  under an elevated pleading standard," and holding that intent must be able to be inferred from a

21  pleading's factual context to survive a motion to dismiss).

22          Here, the Court concludes that both answers contain sufficient factual material from which

23  the Applicants's specific intent to deceive the PTO can reasonably be inferred, particularly given

24  that on a motion to strike this Court must view the pleadings in the light most favorable to the

25  pleader.  *Zep Solar*, 2012 WL 1293873 at *1.  Both answers aver that the Applicants (Larry

26  Schwerin, Joseph Davis, and Barry Young) had significant financial incentives to lie to the PTO

27  during the reissue prosecution of the patents-in-suit.  And Defendants further point to Capella's

28

United States District Court

For the Northern District of California

1    alleged concealment of the nature of the mistake in its patents, and the misrepresentation/excision of

2    the Neukerman and Lucent references to support an inference of specific intent.[14]

3        Barry Young was the prosecuting attorney of the reissue patents,[15] and it is reasonable to

4    infer that he had a personal financial interest in the success of the reissue applications.  Joseph Davis

5    was President and CEO of Capella until 2005, and remains an "Emeritus Board Member" at the

6    company.  FA at 9; CAAC at 9.  Larry Schwerin is the current President and CEO of Capella.  FA at

7    9; CAAC at 9.  Given Messrs. Davis's and Schwerin's respective positions at Capella, it is

8    reasonable to infer that both men have at least some financial interest in the firm.

9        Moreover, with respect to both Davis and Schwerin, Fujitsu further explicitly alleged that

10   specific intent is reasonably inferable because "they stood to profit from the sale of [the] company at

11   a higher valuation or through a patent licensing campaign if the sale failed."  FA at 20.  And Cisco's

12   answer goes into even more detail, alleging that:

13              at or near the time Capella filed the reissue applications that became
                the Patents-in-Suit, Capella was actively trying to sell its patent
14              portfolio (including the pre-reissue versions of the Patents-in-Suit),
                and was likely trying to increase the perceived value of that portfolio
15              and/or prepare it for litigation.  Executives at Capella, including Larry
                Schwerin, would have known that the sale value of the company
16              would be based heavily on the value of its patent portfolio.

17   CAAC at 13.  The above factual allegations, taken together with allegations that Capella

18   misrepresented other references and purposefully filed a misleading request for patent re-issuance,

19   are sufficient to satisfy the intent requirement on a motion to strike.

20       Capella counters that a "desire to make money by obtaining patents (a desire common to

21   nearly every patent applicant)" cannot "support an inference of specific intent to deceive by

22   withholding material information."  Docket No. 132 at 11.  Notably, Capella does not cite any

23   authority in support of this position, and it does not appear to hold up to scrutiny.  The desire to

24

25

26       [14] While Defendants waived any independent inequitable conduct defenses based on
     Neukermans or Lucent, Defendants do claim that Capella's alleged misrepresentations regarding
27   these references can bolster their claim that Capella withheld Smith with the requisite intent.  The
     Court agrees.
28
         [15] FA at 7; CAAC at 7.

**United States District Court**
For the Northern District of California

1    make money is by far the most likely explanation for attempting to obtain patents via acts of

2    inequitable conduct.

3         In any event, there are additional allegations that bolster the inference of specific intent.  For

4    instance, Capella initially refused to identify the precise flaw in its original patents when seeking re-

5    issue, only identifying the error with specificity after the PTO initially rejected its re-issue

6    application.  Moreover, Capella allegedly failed fairly to disclose the Lucent 2-axis mirror – an

7    apparently material piece of 2-D mirror art Capella undoubtedly knew about – to the Patent Office in

8    a filing that was likely to be reviewed by the Examiner.  Taken together, Defendants have

9    adequately pleaded intent at the pleading stage.[16]

10   C.    Cisco's UCL Counterclaim

11        Capella also moves to dismiss Cisco's UCL counterclaim.  Cisco alleges that Capella

12   engaged in a fraudulent business practice by filing this lawsuit against Cisco in bad faith, knowing

13   that the asserted patents-in-suit are invalid and were procured through fraud.[17]  Cisco's UCL claim is

14   closely related to its inequitable conduct defense – if Cisco cannot prove that Capella knew its

15   patents were invalid and/or committed inequitable conduct to obtain them, Cisco would not be able

16

17

18

---

19        [16] Defendants may have to show more to actually prevail on their inequitable conduct
     defenses at summary judgment or trial given the rigorous burden of proof.  *See Exergen*, 575 F.3d at

20   1329 n.5 ("In contrast to the pleading stage, to prevail on the merits, the accused infringer most
     prove . . . intent by clear and convincing evidence," and specific intent to deceive must be "the
     single most reasonable inference able to be drawn from the evidence.") (emphasis omitted).

21        [17] Cisco's pleading also alleges that Capella violated the "fraudulent" prong by: (1)

22   "misrepresenting the validity of the patents, which it knew to be false," (2) "asserting those patents
     against Cisco and other manufacturers"; and (3) "attempting to sell Capella to other California

23   businesses based in part on the fraudulently-obtained patent rights."  CAAC at 22-23.  None of these
     are well-pleaded UCL claims.  As to the first claim, Cisco's pleading does not identify or allege any

24   instance where Capella "misrepresented the validity of its patents" except in the context of this
     lawsuit.  Nor does Cisco allege that Capella actually asserted its patents against other manufacturers

25   outside the context of this lawsuit, which would be necessary to sustain its second UCL claim.
     Hence, these two claims completely overlap with the claim analyzed in the main text of this memo

26   (*i.e.* that the filing of this lawsuit violates the UCL), and must be dismissed. And as for Capella
     attempting to sell the business to third-parties based on its allegedly invalid patents rights, Cisco has

27   no standing to pursue this claim on behalf of those third-parties, nor does Cisco plead any facts to
     support its claim (such as who the alleged third parties are, whether Capella actually made

28   fraudulent representations to those parties about the strength or validity of the patents-in-suit,
     whether those parties relied on such representations, etc).

United States District Court

For the Northern District of California

1    to proceed with its UCL counterclaim predicated on Capella's alleged bad faith assertion of its

2    patent rights.

3         In its motion, Capella argues that the UCL claim must be dismissed for a number of reasons

4    including: (1) Cisco's UCL claim is precluded by the *Noerr-Pennington* doctrine; (2) Cisco's UCL

5    claim is pre-empted by Federal patent law; (3) Cisco cannot show it is entitled to restitution; (4) any

6    injunctive relief awarded under the UCL would be entirely co-extensive with any relief obtained

7    under the Patent Act, and therefore the UCL cause of action is duplicative and essentially moot; and

8    (5) Cisco has not adequately pleaded facts that constitute a violation of the "fraudulent" prong.

9    Docket No. 116 at 13-17.  Because Capella's fifth and final contention (*i.e.*, Cisco has not

10   adequately alleged a fraudulent prong violation) is correct, the Court only discusses that argument.

11        The California Supreme Court has held that a business practice is "fraudulent" in violation of

12   the UCL if "members of the public are likely [to be] deceived by the practice."  *Committee on*

13   *Children's Television v. Gen. Foods. Corp.*, 35 Cal.3d 197, 214 (1983); *see also Nat'l Rural*

14   *Telecomm. Co-op. v. DIRECTV*, 319 F. Supp. 2d 1059, 1077 (C.D. Cal. 2003).  Under this standard,

15   Cisco's UCL counterclaim is fatally defective for two straightforward reasons.  First, Cisco does not

16   allege that members of the public have been deceived by Capella's alleged fraudulent

17   misrepresentations about the strength of its patent rights.  Indeed, Cisco does not even allege that

18   members of the public are aware of Capella's alleged misrepresentations.  *See, e.g.*, *Nat'l Rural*

19   *Telecomm. Co-op.*, 319 F. Supp. 2d at 1078 ("Here, Plaintiffs have not made a showing that the

20   public was impacted at all by DIRECTV's alleged actions.  Thus, Plaintiffs' claims under the

21   'fraudulent' prong of the UCL fail as a matter of law.").  Hence, Cisco has not pleaded a viable UCL

22   claim.

23        Moreover, under prevailing case law, Cisco is not itself a member of the "public," and thus it

24   is ineligible to bring a claim under the fraudulent prong for any alleged misrepresentations Capella

25   made to it.  *See Rosenbluth International, Inc. v. Superior Court*, 101 Cal. App. 4th. 1073, 1077-79

26   (Cal. App. 2002) (holding that "sophisticated corporations" are not members of the "general public"

27   for the purposes of the UCL); *see also Nat'l Rural Telecomm. Co-op.*, 319 F. Supp. 2d at 1078 n.28

28   ("Sophisticated companies, like Plaintiffs here, are not members of the 'general public.'").  As one

United States District Court
For the Northern District of California

judge succinctly explained, a corporate-competitor "is not entitled to the protection of [the fraudulent] prong of § 17200 because it is not a member of the public or a consumer entitled to such protection. The Court has identified no case under the 'fraudulent' prong of § 17200 allowing one competitor to proceed against another on the basis that the defendant deceived him." *Watson Laboratories, Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099, 1121 (C.D. Cal. 2001). Courts in this district have held similarly. *See, e.g.*, *Travelers Prop. Casualty Co. of America v. Centex Homes*, No. 12-0371-SC, 2013 WL 4528956, at *5 (N.D. Cal. Aug. 26, 2013) (holding that corporation could not bring a UCL fraud prong claim absent a showing "that the alleged wrongdoing has some impact on the general public"); *Medical Instrument Development Laboratories v. Alcon Laboratories*, No. C-05-1138 MJJ, 2005 WL 1926673, at *5 (N.D. Cal. Aug. 10, 2005) (same).

At oral argument, Cisco's attorney argued that a rule prohibiting "sophisticated" companies from pursuing fraudulent prong claims under the UCL, while allowing arguably "unsophisticated" companies to bring such claims is inadvisable as a policy matter, and requires the Court to draw an arbitrary line between sophisticated companies and unsophisticated companies. While the Court does not dismiss these arguments out-of-hand, it notes that the rule is one that the California Court of Appeal and other California courts have seen fit to adopt. Cisco's challenge to this line drawing misses the notion established by case law that the protections of the UCL's fraudulent prong are directed to the protection of the "general public"; if a sophisticated business customer is deemed part of the "general public," it is hard to imagine what meaningful limitation would be imposed by that term. Moreover, while in some cases, determining whether a company was so "sophisticated" as to bar a fraudulent prong claim may be subtle, this is not such a case; by any measure or definition, Cisco is a "sophisticated corporation." Thus, Cisco may not bring a UCL action under the fraudulent prong based on Capella's allegedly fraudulent conduct in bringing this lawsuit over purportedly invalid patents.

Because Cisco is not a member of the public itself, and because it does not allege Capella's misrepresentations about the patents-in-suit misled any members of the public, its UCL counterclaim is dismissed with prejudice.

### III.   CONCLUSION

Capella's motions to strike Cisco's and Fujitsu's "first instance of inequitable conduct" are **DENIED.**  Capella's motions to strike the remaining instances of inequitable conduct, however, are **GRANTED**.  Neither Defendant may rely on the Neukermans or Lucent reference to directly state a claim of inequitable conduct.

To the extent Defendants wish to continue to rely on the Neukermans or Lucent references solely for the purpose of proving that Capella withheld the Smith patent with the specific intent to deceive the PTO, Defendants' shall amend the specific intent portion of their defenses within thirty (30) days of the date of this order.

Capella's motion to dismiss Cisco's UCL counterclaim is **GRANTED** with prejudice, as the Court determines that amendment would be futile.

This order disposes of Docket Nos. 115 and 116.


IT IS SO ORDERED.


Dated:  December 23, 2014

_____
EDWARD M. CHEN
United States District Judge

United States District Court
For the Northern District of California